BOGART and JACKSON, Executors, &c., Appellants and VAN VELSOR, Respondent.

Executors were called to account in a surrogate's office by a widow of the testator having a present interest and acting on behalf of infant children ; and at the time of bringing in their accounts they got a citation for creditors to attend a final settlement : *Held,* that—although this was going beyond the original application—the widow and creditors would be bound by it, but not the children, as there was not to be a distribution until they came of age.

Even where executors loan on real estate, they must use care as to title and ascertain that the value is such as will, in all probability, be an adequate security for repayment whenever the money shall be called in.

Criterion of value for executors in loaning on real estate is the estimate of men of ordinary prudence who would deem it safe to make a like loan with their own money.

Testimony of conversations which happened several years ago, is to be received with great caution; and especially when it comes from witnesses nearly related to a party in interest.

Good faith and honest intentions will not protect men in the performance of a

trust when they depart from prudential rules which the experience of others in similar transactions have approved as the only safe guides.

In construing a receipt which embraces several sums, the words with which it ends may be made to qualify the first sum and is not, necessarily, to be confined to the last antecedent.

BY the will of Cornelius Van Velsor, his widow Phebe Van Velsor and two infant children were interested in his estate. His executors were the present appellants Jacob Jackson and Andris Bogert. After a lapse of eighteen months from the time of the will being proved, the widow petitioned the surrogate of Queen's County (on behalf of herself and the children) that the executors should render their account. This was, accordingly, ordered. The executors presented their account; and, at the same time, obtained a citation from the surrogate requiring the creditors to attend the settlement. But the accounts of the said executors were objected to (at the time of presentation) mainly on the ground of an insufficient bond and mortgage made by Henry Horton in favor of the executors for securing $800 and interest—another point had relation to the amounts of interest paid over by the executors to the widow.

*October, 1848.*

*Executor.
Mortgage.
Evidence.
Trust.
Receipt.*

This mortgage which the executors had taken was a second mortgage. Horton, the mortgagor, had given $2300 for the property embraced by it, giving a first mortgage back for $1300. This was in the year 1840. There was a foreclosure upon this first mortgage in the year 1843 and the property sold under it for only $1100: so that nothing was made or had been paid upon the second mortgage taken by executors. It was proved that the executors were not present and did not attempt to protect the property on the sale in foreclosure. The widow insisted that they would have to make good the amount. The bond accompanying the mortgage had the name of George Duryea in it as a co-obligor; but it was only executed by Henry Horton. Testimony was taken before the surrogate. Among the witnesses were two of the sisters of the widow who deposed to conversations when she was said to have objected to the making of the loan of the $800 to Horton. Another witness, *Abraham Van Wicklen,* who had land adjoining the mortgaged premises, deposed

that he considered the latter worth what Horton gave for it at the time. This witness spoke well of the moral character of the mortgagor Henry Horton. He considered the second mortgage safe at the time. Farms had decreased in value considerably between the years 1840 and 1843. "If I had held the second mortgage, I would have bid it as high as eighteen hundred dollars before I would have let it went away." *William H. Jones*, another witness, after speaking of the executors as honest and men of good judgment, testified that a half or two thirds were loaned on the value of real estate. He should not have been willing to loan within $200 of the value—and the taking of a second mortgage would be another consideration. "If the man was sober and industrious, I would let the amount loaned be nearer the value of the real estate than if he was not possessed of these qualities." *John L. Van Wicklen*, another witness : "Horton was reputed to be worth $200 in money beyond his furniture, &c. I do not think on the foreclosure that Horton's place brought the worth of it. I know people who would have given more. I should have let Horton have had the $800 if I had had it and no good place to put it out ; but I would have depended on the man a good deal being sober and industrious." *Hewlett Valentine* affirmed that he was in the habit of loaning money on bond and mortgage. His rule was to loan about half of the value of the security ; and if the man was good he would lend a little more. Dr. *Selah S. Carll* : " The executors informed me that he" (Horton) " had purchased the farm and was going to let him have $800 ; knew there was a previous mortgage ; supposed the investment was safe. Mr. Horton was very industrious and supposed he would get along and make the payment. He paid a little over $2000 for the farm. Real estate has depreciated with us since 1840. Some farms have depreciated one third and one farm I know of has been sold and depreciated more than one third. It depends upon the location in some measure. I do not think now it would bring over $1500, if that. I knew the amount of the first mortgage. I thought the investment was safe, relying on his, Horton's, character and on the farm conjointly. I do not suppose he had much, he was just out of his time and

was a steady, industrious young man ; have put out money on bond and mortgage, generally calculated on two thirds of the value of real estate ; prices had been inflated for a number of years and depression had not commenced therein in 1840; should not conceive it prudent to loan $2100 on a place sold for $2300.   If I had had the money I don't know but that I should have lent it to Horton ; should have relied as much on Horton as on the land."

The surrogate, among other things, found as follows : " And the surrogate having deliberated on the said testimony doth decide and determine that the loss on the bond and mortgage of Henry Horton be charged to the said executors with interest thereon at the rate of five per cent. per annum from the twenty-first day of February one thousand eight hundred and forty-four, it clearly appearing from the testimony that ordinary care and prudence were not exercised in making the said loan, as is evinced by taking a second mortgage and for almost the purchase price of the farm mortgaged, against the wishes and remonstrances of the said Phebe Van Velsor."

The executors appealed.

Mr. *W. J. Cogswell*, for the appellants.

Mr. *W. S. Smith*, for the respondent.

McCoun, Justice :—The objection that the surrogate had not acquired jurisdiction to enable him to make such a decree as he has made, is not well founded.   The application of Mrs. Van Velsor to have the executors "render an account of their proceedings" was the commencement of a proceeding within the surrogate's jurisdiction ; and upon being cited before the surrogate for that purpose it depended on the executors themselves whether the surrogate should do more than require them to render their account : 2 R. S. 33 (2d ed. sec. 60.)   The rendering of an account and the settlement or adjustment of it after it has been rendered are or may be made distinct proceedings : *Westervelt* v. *Gregg*, 1 Barb. Ch. R. 469.   It appears, in this instance, that the executors were desirous of having their account settled when

rendered and, therefore, they prayed a citation for the credi-
tors.   In doing this, they invoked the jurisdiction of the sur-
rogate beyond what the original application had done—they
called on him to examine and pass upon their accounts and
upon the claims of creditors.   It is true that such adjudica-
tion might not be binding absolutely upon the children, nor
the settlement amount to a final settlement with a view to
an immediate distribution of the fund and a discharge of the
executors, (the time for that purpose by the will not having
arrived, the children being yet under age) but, as to the
widow and the creditors, it would be final so as to bar all
further claims of the latter and at the same time ascertain
the amount of money remaining at interest or to be kept in-
vested for the widow's benefit.   The appellant, therefore,
cannot now raise an objection to the surrogate's want of au-
thority to make so comprehensive a decree as he has made
in this case.

I proceed, therefore, to examine the other questions raised
by this appeal.

The first is, whether the decree is erroneous in charging
the appellants with the loss of the Horton loan?   The rea-
son for the decree in that respect is the inadequacy of the
security on which that loan of eight hundred dollars was
made.   As a general rule, executors and trustees are not
warranted in lending money of the estate on mere personal
security, such as the bond or promissory note of the bor-
rower.   A court of equity will hold them bound to make
good a loss sustained in such securities, because other and
better, as government stocks and mortgages of real estate,
are accessible to them as means of safe investment.   But in
lending money even on mortgage of real estate, a degree of
care is necessary, which, if omitted, will render executors
or trustees personally liable.   They are bound to use ordi-
nary care to ascertain that the title of the mortgage is valid
and that the value of the property at the time of the loan is
such as will, in all probability, be an adequate security for
the repayment with the interest whenever the money shall
be called in.   The criterion of value in such cases is the
opinion or estimate of men of ordinary prudence who would
deem it safe to make a loan of the like amount of their own

money on the same property. Such men have adopted a
rule (as the evidence in this case shows—and it is the only
safe practical rule) not to lend more than from one half to
two thirds of the value of the property mortgaged. If the
appellants have followed this rule, they are not to be held
responsible for a failure of the security. The proofs show
that in the spring of 1840, Horton, the mortgagor, contracted
for the purchase of the farm at the price of two thousand
three hundred dollars ; that he had two hundred dollars of
his own money, which he paid on account of the purchase
and, on taking the title in the fall of 1840, he gave his gran-
tor a mortgage for thirteen hundred dollars as a first incum-
brance and the balance of the purchase money he paid with
the eight hundred dollars borrowed of the appellants and
for which he executed to them a second mortgage accom-
panied by his bond ; that in 1843, the first mortgage was
foreclosed and the property was sold under it and was bought
in by the person holding that mortgage for eleven hundred
dollars, the appellants not attending the sale and no one in
their behalf making a bid upon it. Now, supposing the
property to have been worth two thousand three hundred
dollars in 1840, (which, from the testimony—if not overra-
ted—was the utmost value of it at that time)—the loans
to be secure upon it should not have exceeded fifteen
hundred dollars. The appellants thus acted without the
ordinary care and prudence of money lenders when they
loaned the eight hundred dollars in addition to the thirteen
hundred dollars for which the property was already mort-
gaged. It is true that several of the witnesses speak of it
as being in their judgment a safe loan at the time ; but it is
evident that they speak with reference to the good charac-
ter, steady habits, industry and capacity of the borrower in
the way of his trade—that of a carpenter—as furnishing a
considerable portion of the security on which they were to
rely ; and it is more than probable likewise that the appel-
lants felt the same confidence in his ability to work through
and pay off the debt and trusted to that as much or more
than they did to a forced sale of the property afterwards for
their reimbursement.

 This view of the subject is somewhat strengthened by a

circumstance appearing in the case and which was urged on the argument as showing that the appellants, at the time of making the loan, placed not much confidence in the security of the mortgage, but intended to rely mainly on the bond, the bond having been drawn with the name of George Duryea inserted as a co-obligor and surety, though he did not execute it; and it appears he never was called upon or requested to execute it. If, then, they made a loan exceeding two thirds of the fair and reasonable value of the property relying upon the supposed ability of the borrower and the bond which he should give them, they must not complain if the law charges them with the consequences of a departure from established practice and compels them to take such unfortunate securities to themselves.

Another view of the case leads to the same result. The appellants did not attend the sale of the mortgaged property under the first mortgage : and took no step whatever to prevent a sacrifice of it. Though the testimony shows that property in that vicinity had declined in price very considerably from 1840 to 1843, yet it is difficult to believe that the property in question had so much depreciated in value as not to be worth something more than the first mortgage. One of their witnesses says, he thinks the property at the foreclosure sale did not bring the worth of it—and he knew people who would have given more for it. Another says, that if he had held the second mortgage he would have bid it as high as eighteen hundred dollars. Doctor Carll, their last witness, thinks it would now bring fifteen hundred dollars. It appears that only seven or eight persons attended the sale—and there was scarcely any competition or bidding. Under the circumstances, I cannot but think it was the duty of the appellants to attend the sale and, with the money of the estate remaining in their hands, to buy in the property, even to the amount of the first mortgage debt. On a resale they could have realized a portion, at least, of their own. No reason is assigned why they did not take that course. As second mortgagees they were bound to spare no pains to make their mortgage available. If, indeed, they had become convinced of the fruitlessness of any such effort, then they are placed in the dilemma of having

lent the money upon a grossly inadequate security of real estate and without the precautions which prudent money lenders would use in respect to the excess in value of the property over the amount loaned; thus, in effect, reducing it to the condition of a loan on the mere bond of the borrower—a consequence which imposes on them the duty of assuming the debt. This conclusion would be very much strengthened if the testimony of the two witnesses on the part of Mrs. Van Velsor, (her sister and her daughter) can be implicitly relied on. Testimony of conversations which happened four or five years before any thing occurs to call it forth is always to be received with great caution; and especially when it comes from witnesses so intimately and nearly related to the party in interest as these two witnesses are. But, making all due allowance for their bias and their liability to exaggerate or misconstrue what may have passed in the conversations alluded to, enough probably was said by Mrs. Van Velsor to put the executors on their guard in relation to lending the money of the estate to Horton. They, notwithstanding, deemed it safe to do so—honestly and in good faith they made the loan, but good faith and honest intentions will not protect men in the performance of a trust when they depart from prudential rules which the experience of others in similar transactions have approved as the only safe guides.

A point has been made by the appellants' counsel on the argument, that because they would have been justified in lending to two thirds of the value of the property they ought to be charged with only so much of the debt as exceeds that standard, which would be about six hundred dollars. It is a sufficient answer to this proposition to say that if the appellants have been so indiscreet as to lend on the property six hundred dollars more than they ought to have loaned, they have been equally indiscreet in omitting to buy in or to redeem from the first mortgage, by which they have suffered a loss to the estate of the other two hundred dollars.

The only other point made and insisted on by the appellants' counsel on the hearing of the appeal is that the decree is erroneous in charging the appellants with ninety-six dollars and seventy-six cents for interest which accrued previ-

ous to the twenty-first day of February 1844 as still due and unpaid to Mrs. Van Velsor. The executors appear to have been somewhat careless in the manner of taking receipts for payments of interest made to Mrs. Van Velsor from time to time and in not keeping a regular account of all such payments.

It would seem, from Doctor Carll's testimony, that having the notes in his possession given by the two executors for the money in their hands respectively, on which they paid interest to the widow, he has paid over to her interest money. How much or when particularly he does not say, but it must have been before the twenty-first day of February 1844; and for which no voucher or receipt has been produced. The receipts produced are for payments of interest made directly by the executors themselves to the widow, and the one most relied on as showing the erroneousness of the decree in charging them with back interest is the receipt given by her to Mr. Bogart, specifying three different sums paid—viz: "Twelve dollars on account of interest on Horton's bond and thirty-one dollars and twenty five cents as interest on Jacob Jackson's note and three dollars and thirty cents as interest due on A. Bogart's note in full up to the first day of May 1844." Now, there is no reason why the concluding words " in full, &c." should not as well apply to the interest paid on Jackson's note as to that of Bogart's—both sums are expressed to be paid "as interest." And the interest on each note seems to have been calculated up to the particular day specified—hence the twenty-five cents in one payment and the thirty cents in the other. Besides, there is the strong probability that, acting as they did together and in concert, both paying interest at the same time on their respective notes, both would pay the interest in full. Hence the receipt is to be understood as evidence of payment in full to the first day of May 1844, of interest on the two notes. Taking that fact to be established, there is then only the Horton debt of eight hundred dollars on which any arrears of interest could be due. This, for the whole time from the twenty-first day of December 1840 to the twenty-first day of February 1844 amounts to one hundred and fifty-two dollars. From this sum, deduct the payments clearly appearing to

have been received by Mrs. Van Velsor as interest on this bond debt—viz : say thirty-five dollars for its proportion of the ninety-eight dollars and twenty-seven cents paid for interest on the whole twenty-three hundred dollars May 2d 1841 and forty-eight dollars being one year's interest on the eight hundred dollars received by her on the 4th October 1843 and the twelve dollars included in the last receipt, and there would remain but fifty-seven dollars or thereabouts for arrears of interest, instead of the ninety-six dollars and seventy-six cents mentioned in the decree.

But I am not satisfied to charge the appellants with any arrears of interest in the face of that receipt. The words "in full" &c. in my opinion may be extended to the interest money then paid on the Horton bond as well as the notes. It is true the receipt declares the twelve dollars to be on account of interest on Horton's bond : it might be on account and yet be in full—and there is no expression showing there were still arrears or that the payment was on account of arrears of interest. The words "on account" as therein used may be controlled in their meaning by the subsequent words "in full up to the first day of May." In *Areson* v. *Areson*, 3 Denio, 458 (in the court of errors,) it was held that words at the end of a clause in a will were not to be confined in their application to the last antecedent, but should be allowed to qualify all that had preceded in the same sentence or clause. That principle seems applicable here.

The decree of the surrogate must be reversed in that part of it which directs the appellants to pay the ninety-six dollars and seventy-six cents as and for interest which had accrued the first day of February 1844. In all other respects the decree is affirmed. Such being the result of the appeal, each party must be left to bear their own costs of it.