# SUPREME COURT.

EDWARD SAVAGE, as executor, &c., appellant, agt. MARY L. GOULD *et al.*, respondents.

*Accounting by executor and testamentary trustee — Improper investment of trust funds — Executor's personal liability for acts of agent — also to account for commissions made on loans.*

An executor must exercise due diligence in the making of loans to protect himself from personal liability for losses.

The taking second mortgages and reliance upon the judgment of others not such diligence.

When mortgages so improperly taken are foreclosed and bought in by him for the estate, executor is liable for costs, taxes, &c.

Commissions allowed to a trustee out of trust funds by mortgagees, or to his attorney, when the trustee is to share therein, remain the funds of the estate and are to be accounted for as such.

That some service was rendered by the attorney will not alter this rule when the amount is manifestly excessive, as compensation and the burden is upon the executor to establish such value.

*Third Department, General Term, January,* 1880.

THE facts are the same as in the appeal from the order of removal (*Supra p.* 234).

*Charles W. Mead* and *Edwin Countryman,* for appellants.

I. It was the plain and unquestionable duty of the trustee to convert the securities of the estate, other than mortgages,

into cash, and invest in bond and mortgage as he was directed to do by the terms of the will. 1. The authorities are uniform that the trustee must follow the direction of the trust instrument as to making investments (*Burrill* agt. *Sheil,* 2 *Barb.,* 457, 469 ; *Gilman* agt. *Gilman,* 2 *Lans.,* 1, 6 ; *Forbes* agt. *Ross,* 2 *Bro. C. C.,* 430; *S. C.,* 2 *Cox,* 113 ; *Perry on Tr., secs.* 452, 460, 470 ; *Ackerman* agt. *Emott,* 4 *Barb.,* 626 ; *Bohde* agt. *Bruner,* 2 *Redfield,* 333 ; *Mant* agt. *Leith,* 15 *Beav.,* 524 *and* 527). 2. Even had the trust instrument been silent on the subject, his duty would have been the same as to conversion and investment (*Gillespie* agt. *Brooks,* 2 *Redfield,* 349 ; 1 *Perry on Tr., sec.* 440). 3. The onus of showing that no conversion of securities is intended is on those who say it is not (*Morgan* agt. *Morgan,* 14 *Beav.,* 72 ; *Blann* agt. *Bell,* 2 *Degex, McN. & G.,* 775, 779). 4. The terms of the will and the general rules laid down by courts of equity coinciding in this case, it would not be possible to more completely justify the course of the trustee. 5. In performing this duty of converting the assets, the trustee exercised such good faith and prudence as to secure a net gain of nearly $12,000 to the estate. (*a*) In all these cases the values of the securities were lower both at the time of appraisal and at the time of rendering the account than at the intermediate time of sale. In some cases the lowest price was *before,* and in other cases *after* the time of sale, but in all cases the trustee took advantage of the highest prices to realize the cash on the securities he was required to sell. 6. The mortgages outstanding at the time of testator's death have not been disturbed.

II. In making the investments which are disallowed by the surrogate, the appellant exercised the utmost degree of care and prudence which is required of a trustee. 1. Investigations and inquiries as to the value of the property, and also as to the title, &c., were in each case made and reported to him by Mr. C. (*a*) C. was not the mortgagor's solicitor, but the trustee's own partner, a lawyer in whom he had

Savage agt. Gould *et al.*

entire confidence, and who was employed for the requisite services because of that confidence. (*b*) This confidence was reasonably based upon the relations between C. and himself. (*c*) It was further justified by the observation and experience of the trustee in reference to Mr. C.'s estimates upon property which they had examined together. (*d*) The course of the trustee was that which is in universal practice in such cases, viz., that services of this kind should be performed by the solicitor of the mortgagee, though paid for by the mortgagor. 2. In the case of the most important loan (that of $5,000 to Geo. Martin), the trustee obtained the valuation of an expert, a competent real estate agent of the city of Albany, who placed a value upon the property of more than three times the amount of the loan. 3. In respect to all of these mortgages, the trustee, before making the investments, had such information regarding the value of the property as would show the investment to be proper and judicious under the strictest rules of the courts, and the correctness of such information was established by the evidence given on the accounting. (*a*) The market price and the value as determined by actual sales, are considered by prudent business men, as well as by the courts, the best evidence of value. (*b*) Opinions of value are a weaker kind of evidence, to be depended upon when actual sales or the market price cannot be shown (*Graham* agt. *Maitland*, 37 *How.*, 307, 309; *Mains* agt. *Haight*, 14 *Barb.*, 76, 83, 84; *Harrison* agt. *Glover*, 72 *N. Y.*, 451, 454, 455; *Whipple* agt. *Walpole*, 10 *N. H.*, 130; *Beard* agt. *Kirk*, 11 *N. H.*, 398, 401; *Kellogg* agt. *Krauser*, 14 *Serg. & Rawle*, 137, 142; *Brill* agt. *Flagler*, 23 *Wend.*, 354, 356). 3. In reference to these investments, evidence was offered by the trustees as bearing upon the actual values and also upon the question of his good faith and prudence, which was improperly rejected by the surrogate. (*a*) The evidence thus offered was of numerous sales of lots of the same kind and in the immediate vicinity of the mortgaged property at or near the time of the respective

loans. (*b*) The best proof of such transactions was the conveyances themselves as the first link in the chain of evidence. (*c*) In one instance the conveyance offered in evidence was of a portion of the very property included in the mortgage. (*d*) There was also coupled with these various offers the additional offer to show that the trustee had knowledge of the sales at the time of the loans, and relied upon that information in part in making them. These various offers and the rulings of the surrogate thereon will be found in case.

III. The trustee having, in good faith, invested the funds of the estate in the kind of investment directed by the testátor, and with that degree of care, diligence and prudence which prudent men of discretion and intelligence in such matters employ in their own like affairs, he cannot be charged with any loss that may have occurred (*King* agt. *Talbot*, 40 *N. Y.*, 76 ; *Harvard Coll.* agt. *Amory*, 9 *Pick.*, 461 ; *Brown* agt. *French*, 125 *Mass.*, 410 ; *Lovell* agt. *Minott*, 20 *Pick.*, 116 ; *Thompson* agt. *Brown*, 4 *Johns. Ch.*, 619, especially 628, *et seq.; Jones* agt. *Lewis*, 3 *De Gex. & Sm.*, 471; *Mikel* agt. *Mikel*, 5 *Rich. Eq.*, 220 ; *Gray* agt. *Lynch*, 8 *Gill.*, 403 ; *Neff's App.*, 51 *Penn. Stat.*, 91). A trustee who is an attorney is entitled to his taxed costs in a suit conducted by him for the estate when paid by the other party to the suit (*In the Matter of the Bank of Niagara*, 6 *Paige*, 213, 215 ; *Collier* agt. *Munn*, 41 *N. Y.*, 143, 147).

IV. The trustee cannot be required to account to this estate for the compensations paid by the morgagors for legal services rendered in connection with mortgages which are accepted by the respondents and all their benefits retained by the estate. 1. They were not paid by the estate, nor out of the funds of the estate, nor for services rendered to the estate. 2. They were not profits made by the trustee or his partner out of estate funds, but the wages for services actually rendered. A trustee who was a solicitor sold out stock forming

Savage agt. Gould *et al.*

part of the trust estate, and invested it in mortgage. He acted in the transaction as solicitor for the mortgagor as well as for the trust estate, but made no charge against the trust estate for his services, being paid for them by the mortgagor. He also derived some profit as a solicitor in consequence of the employment of part of the mortgaged estate for building purposes. The court of appeals in Chancery held that the *cestui que trust* could not charge him with the profit thus made, as having been made by the employment of the trust estate in business (1869, *Whitney* agt. *Smith ; Law Reports*, 4 *Ch. App.*, 513). Where a trustee deposited trust funds with a banking firm of which he was a member. Held, by the supreme court of Pennsylvania that the fact that he as one of the firm might have received profit from the use of the moneys so deposited, would not make him liable for interest on the fund (1871, *Hess Estate*, 68 *Penn. St.*, 454). 3. They were not usurious (*Harger* agt. *McCullough*, 3 *Denio*, 119 ; *Eaton* agt. *Alger*, 2 *Abb. Ct. App. Dec.* 5 ; *S. C.*, 2 *Keyes*, 41, 47 ; *Thurston* agt. *Cornell*, 38 *N. Y.*, 281 ; *Eldredge* agt. *Reed*, 2 *Sweeney*, 155 ; *Wheaton* agt. *Voorhies*, 53 *How. Pr.*, 319 ; *Van Tassell* agt. *Wood*, 19 *Alb. Law J.*, 217, *reversing S. C.*, 12 *Hun*, 388 ; *Matthews* agt. *Coe*, 70 *N. Y.*, 239). 4. There being no evidence whatever that the amounts so paid were unusual or extortionate, there can be no presumption that they were other than what it is claimed by the trustee that they were, viz. : fair and reasonable compensations for services actually rendered to the mortgagors. 5. They were entirely unobjectionable, unless it is unwise and imprudent for a trustee or mortgagee to require the mortgagor to employ and pay such mortgagee's own solicitor to manage legal transactions and pass upon legal questions which are of the utmost importance to the estate or fund under his control (*See Eldridge* agt. *Reed*, 2 *Sweeney*, 115 ; *Wheaton* agt. *Voorhies*, 53 *How. Pr.*, 319, 320, 321). 6. The course pursued in this estate being in accordance with the practice established in the lifetime of the testator, he

must have expected and intended that the same methods would be adopted in the investment of the trust funds under his own will.   7.  Under no circumstances could the trustee be held chargeable with those compensations which were received by Case alone, or with the portion received by Case of those which were shared as partnership earnings.   (*a*) A trustee's partner may receive fees to himself, even from the estate, for services rendered to the estate (*Lewin on Trusts,* 240; *Clack* agt. *Carlon,* 30 *Law J. Ch.,* 640).   (*b*) A trustee cannot in any event be charged with more than he has received (*Osgood* agt. *Franklin,* 2 *Johns. Ch.* 1, 27; *Hamburgh Man. Co.* agt. *Edsall,* 1 *Beas.* [12 *N. J. Eq.*], 392, 401; *Jones* agt. *Foxall,* 15 *Bea.,* 388, 395).

*Alva H. Tremain* and *Andrew Hamilton,* for respondents.
I. The moneys received on account of loans by the appellant and his partner, or by the partner and enjoyed by the appellant, and which descriptions cover all the moneys charged in item IV, were clearly the avails of dealing with the trust funds, unless they are to be regarded as a part of them, which was never invested, and in either aspect it was the duty of the appellant to account for all of them.   These bonuses will be found (*supra, p.* 7, *schedule* "*D*," *marked as Nos.* 1, 5, 6, 7, 8, 9, 10, 11, 12, 13 *and* 14), which were received and divided between S. and C., and of which the appellant admits he retained his share.   Nos. 16, 17, 18, 19, 20, 22, 23, 24 and 26, which were received by C., paid by him to S. as treasurer of the firm, equally divided between them, and by each their share retained down to May 3, 1876, when they ante-dated their articles of copartnership, dating them back fifteen months after all but $10,800 had been invested, out of a total investment now outstanding of $107,629.33, for fear of the question of usury being raised, and S. pretended to pay back his share to C., by giving him a check for $290.75, months after its receipt and division, whereas the amount thus received by S. was $1,283.37; and Nos. 28, 29, 30 and 31, which S.

in reality participated in by being exempted from the pay-
ment of all office expenses (shown during fifteen months to
be $2,105.25). (*a*) A trustee will not be permitted to make
profit for himself out of the trust property; and he is equally
prohibited from purchasing or dealing with it for his own
gain (*Colburn* agt. *Morton*, 36 *How.*, 150–160, *Court App.*,
and cases; *Same Case*, 5 *Abb.* [*N. S.*], 308 *to* 316, *Court
Appeals*; *Littlye* agt. *Beveridge*, 58 *N. Y.*, 592–606; *Fulton*
agt. *Whitney*, 5 *Hun*, 16; 3 *Redf. on Wills*, 402, 403, 553;
*Story's Equity Jur.*, sec. 1277, a; *Van Epps* agt. *Van
Epps*, 9 *Pai. Ch.*, 237; *Kellogg* agt. *Wood*, 4 *Pai. Ch.*, 578;
*Holloway* agt. *Stevens*, 48 *How.*, 129; *Lewin on Trusts* [*6th
ed.*], 243). This the trustee has done by putting up the job
of letting C. handle the money, abstract large sums therefrom,
while he came in covertly for his share of the plunder. One
who joins with him is also disabled (*Sweet* agt. *Jacocks*, 6 *Pai.
Ch.*, 355). An usage authorizing an agent to make a profit
upon his principal is a usage of fraud and plunder, and cannot
be supported (*Diplock* agt. *Blackburn*, 3 *Campb.*, 43), where
it is held that if the master of a ship in foreign port receive
a premium for a bill on England on the ship's account, although
the usage is for masters to appropriate such premiums to their
own use, yet this belongs to the owner of the ship. A sub-
ordinate or agent of trustee is equally disqualified from
making gains out of the estate, where it is to be shared in any
way by the trustee (*Terwilliger* agt. *Brown*, 44 *N. Y.*, 237–
40–41, *affirming* 59 *Barb.*, 9 ; *Hawley* agt. *Cramer*, 4 *Cow.*,
717). Nor can the trustee or executor give it to one and then
take back a part to himself (*Powers* agt. *Powers*, 48 *How.*,
389). If he charged a bonus in his account for skill and
services in conducting the business of the trust, it will be set
aside (*Perry on Trusts*, *vol.* 1, *secs.* 427, 428, 429, *and vol.* 2,
*sec.* 904). No profit can be made by them for increase (3 *Rev.
St.* [*6th ed.*], *sec.* 70, *p.* 101). Nor can his partner make any
profits out of the trust funds, or for the performing of serv-
ices, unless the partner alone takes the profits. Nor can

either charge for professional services where both would share in the proceeds (3 *Redf. on Wills*, 556, *sec.* 118 ; 3 *Redf. on Wells*, 416, *note ; Collier* agt. *Munn*, 41 *N. Y.*, 143, 146 ; *Perry on Trusts*, vol. 1, *pp.* 520–21, *sec.* 432 ; *Lewin on Trusts* [*6th ed.*], 249, 243). Whether usurious or not, the trustee must account for all gains (*Perry on Trusts*, vol. 1, *p.* 571, *sec.* 468 ; 3 *Redf. on Wills*, 406, *secs.* 18). The rule in England and America is that a trustee must account for all profit he has made (3 *Redf. on Wills*, 402, *secs.* 10, 11 ; 403, *sec.* 12 ; 406, *sec.* 18 ; *Utica Ins. Co.* agt. *Lynch*, 11 *Paige Ch.*, 520). Trustee cannot even charge costs in an action against him personally for acts arising out of his attempts to protect trust property (*Pierson* agt. *Thompson*, 1 *Edw. Ch.*, 212). Thus showing 'how strictly the rule is applied to trustees who seek to make litigation for the purpose of taking costs out of the estate as they have done in this estate, the amount being over $1,997.30, as already proved, with five other foreclosures pending, part of which were defended by pleas of usury, and in which costs would doubtless be $2,500 more. All he is entitled to, under the statutes, is the commissions that the law gives him and his necessary expenses ; hence, all other profits go to the estate (3 *R. S.* [*6th ed.*], *p.* 101, *sec.* 58 ; *Id.*, *p.* 102, *sec.* 66). All these bonuses should have been accounted for and were property of the trust (*Perry on Trusts*, vol. 1, *secs.* 427–430, *and sec.* 468, *p.* 571 ; *Tiffany on Trusts*, 554–558). Being the moneys and profits of the trust, appellant refused to include them in account, appropriating them to his own use, endeavored to conceal their receipt and hide it from investigation or discovery by his antedated articles of copartnership, and calling it expenses of office and otherwise. (*b*) These moneys cannot be regarded as mere legal expenses incurred and charged for services in perfecting searches and papers. This view is placed entirely out of question when the amounts charged are compared with the amount of the loan. (*c*) C. was the agent in these loans of the trustee. His receipt in every case says so : " Received, Albany,

N. Y., April 9, 1875, of S., executor and trustee, &c., fifteen hundred dollars, to be loaned to Joseph Fellows for one year from date thereof on bond and mortgage. (Signed) T. L. C." C. being such an agent of S., and S. being the trustee and responsible to the respondents, these amounts which were taken as bonuses were really the moneys of the estate which had never been invested. They never left the hands of the appellant and his partner C., who was given the money to "invest," &c. In each case they took their moneys out of the fund that was to be loaned, so that in fact it never was loaned, but remained the money of the estate in their hands. In every one of these cases the bonuses belong to the estate (*Perry on Trusts, secs.* 429, 430, *vol.* 1, *p.* 571). (*e*) Regarding C. as the agent of S., there is no substantial difference between the bonuses which S. took and kept, or took, kept and pretended to return to his agent, or took indirectly from his agent as office expenses. The agent is equally estopped with his principal, who is liable for his acts and accountable for his receipts and profits. (*a*) It was the duty of the trustee to see that the investments were secure, productive of interest, and subject to future recall (*Ackerman* agt. *Emmott,* 4 *Bar.,* 626; *King* agt. *Talbot,* 40 *N. Y.,* 76, 86, 88; *affirming same case,* 50 *Barb.,* 453, 484; *Tiffany on Trusts,* 587, 600, 601, 602, 603; *Smith* agt. *Smith,* 4 *Johns. Ch.,* 281; 4 *Edw. Ch.,* 718). A trustee should not loan more than one-half to two-thirds of the value of the property (*Bogart* agt. *Vanvelsor,* 4 *Ed. Ch.,* 718–722, 723; 40 *N. Y., supra; Dayton Sur.,* 522). It may be improper to loan even two-thirds (*Perry, vol.* 1, *p.* 549, *sec.* 457; *Lewin on Trusts* [6th ed.], 286). (As when, as in this case, loans are made on a falling market.) In each of these cases the evidence conclusively established not only that the amount loaned was in excess of this rule of two-thirds, but the full value of the property was in no instance as great as the mortgage, but that it was practically worthless. Where this rule is violated it is well settled that the trustee is personally liable for the loss accruing (40 *N. Y.,*

76, *supra ;* 50 *Barb.*, 453, *supra ;* 4 *Edw. Ch.*, 718, *supra ;* 3 *Redf. on Wills,* 559 ; *Baker* agt. *Disbrow,* 18 *Hun,* 29 ; *Gillespie* agt. *Brooks,* 2 *Redf. Rep.,* 349–360). And a *cestui que trust* is at liberty to elect to approve an unauthorized investment or reject it at his option (*Id ;* 3 *Redf. on Wills, sec.* 452; *Dayton on Sur.,* 522). And where separate investments are made, he may adopt or reject each, as his interest dictates (*Id. ; Perry on Trusts, sec.* 621, *vol.*   ). And where improper investments are rejected, the trustee can be charged with the amounts and legal interest thereon (*Baker* agt. *Disbrow, supra ; King* agt *Talbot, supra ; Tiffany on Trusts,* 593–595; *Perry on Trusts, vol.* 1, *secs.* 468–472 ; *Bodie* agt. *Bruner,* 2 *Redf. Rep.,* 333–337 ; 3 *Redf. on Wills,* 402). (*b*) It is no answer to charge Case with these wrongs, whether he be regarded as the agent of the mortgagor or the appellant. A trustee cannot give funds to a solicitor, and allow him to misapply them, and then escape responsibility (*Brown's Accounting,* 16 *Abb.* [*N. S.*], 457 *and* 466, *and numerous cases cited ; Tiffany on Trusts,* 597, 570 ; 3 *Redf. on Wills,* 547, 548 ; *Perry on Trusts, vol.* 1, *sec.* 402). If trustees rely upon a valuation made by the mortgagor, or a surveyor, who is his agent, without having a survey of the value on behalf of the estate, it is a breach of trust, and they will be held liable for any deficiency in the value of the security (*Lewin on Trusts* [*6th ed.*], *p.* 286, *sec.* 25). Nor must he employ the solicitor of the borrower to fix upon the value or survey, which he did in every loan (*Lewin on Trusts* [*6th ed.*], *p.* 279, § 59). (*c*) The Fellows second mortgage of $900, treated as an investment, was, within the rule, properly charged against the appellant. A trustee should never loan on second mortgage (*Perry on Trusts, vol.* 1, *p.* 550, *sec.* 457 ; *Lewin on Trusts* [*6th ed.*], *p* 291, *sec.* 40).

IV. In item VIII of decree the surrogate properly disallowed the credit claimed for appellant's commissions, $500. He claimed to take them on his own responsibility. This merely rejected the amount as a credit of $500 on the date of July

3, 1877, and allowed it in full finally, with his other commissions, as of the date of settling the decree and allowance of commissions by the surrogate. There is no power in a trustee to take his commissions out of the estate until they are allowed by the surrogate, and if they are taken before they will be charged with legal interest (*Redf. Sur. Prac.*, 385 ; *Wheelright* agt. *Wheelright*, 2 *Redf. Reps.*, 501 ; 3 *Rev. Statutes* [*6th ed.*], *p.* 101, *sec.* 71).

V. The appellant was properly charged with legal interest on the improper investment rejected, and on the bonuses for which he refused to account, and which was a part of the original money he pretended to loan. Where the acts of a trustee are willful, he is to be charged with interest at the legal rate of seven per cent (*Baker* agt. *Disbrow*, 18 *Hun*, 29 ; *Perry on Trusts, vol.* 1, *secs.* 468–472 ; *Tiffany on Trusts*, 593–595 ; *King* agt. *Talbot*, 40 *N. Y.*, 95 ; *Bodie* agt. *Brunen*, 2 *Red. Sur. Rep.*, 333, 337).

VI. Appellant was properly charged with all the items of disbursements, in connection with the improper investments rejected, and interest thereon. The property received by the estate was returned to him, and he merely is charged with and pays back the price which it cost the estate.

VII. The counsel fee, which was claimed below, should go to counsel and not to executor, was correctly allowed to the executor (*Laws* 1863, *ch.* 362, *sec.* 8, *sub.* 4; *Brown's Accounting*, 16 *Abb. N. S.*, 457, 469 ; *See all decrees in Albany Surrogate's Court since* 1863 ; *Betts* agt. *Betts*, 4 *Abb.* [*N. S.*], 436 ; *Devin* agt, *Patchin*, 26 *N. Y.*, 441). They sought to show value of property and good faith of trustee by simply introducing deeds and records of other pieces of real estate as recorded in Albany and Rensselaer counties. In each case the surrogate held that they could show value and good faith in any legal way, but he would not take the record of consideration in other deeds, and of other property, as a basis of the value of the property in question ; but in every case they were allowed to show the appellant's good faith, by testi-

mony that he had acted upon the strength of such records and sales. It was only to the rejection of these records as evidences of value (and not as influencing the appellant) that any exception was taken.

BOARDMAN, *J.* This is an appeal by the executor from the decree of the surrogate of Albany county upon a final accounting. The executor was disallowed the amount of certain investments made by him for the reason that he had not exercised due diligence, or any care or diligence in making such loans. The evidence fully sustains such allegations. In some cases the property was worthless. In other cases the security taken was a second mortgage, while the first was for the full value of the mortgaged premises. In still other instances the mortgaged premises were barely of sufficient value to pay the expenses of foreclosure. Again, a second mortgage was purchased by himself when the prior incumbrance upon the property exceeded its full value. The executor had used no caution in making these loans; he had not examined the property or secured proper searches and valuations before making the loans. Casual inquiries were made by Case, his law partner, and large sums of money were loaned by Case upon his own discretion and judgment. As a consequence the estate lost heavily. In some cases not a dollar of interest was ever paid. The mortgagors were insolvent and they were satisfied with the prices which they had got out of this executor for their property and abandoned it to him or the estate. The most ordinary business tact and talent, the lowest degree of care and prudence would have protected the estate from such miserable and worthless loans and consequent losses. The executor was properly disallowed such investments (*Bogart* agt. *Van Velser*, 4 *Edw. Ch. Rep.*, 718).

The executor was properly chargeable with the amount specified in the eighth item of the decree. He was with equal justice charged with costs, expenses, taxes, &c., which flowed naturally and necessarily from such original negli-

Savage agt. Gould *et al.*

gence. These items are also disallowed in eighth item of decree.

The executor is also charged with certain amounts received upon loans made, as specified in item 4 of the decree ff. 3798, &c., to which exception is taken.

The moneys were received by the executor or his law partner as a bonus or commission for the loans made. It is true that some services were rendered, and, perhaps, some slight expenses paid by Case, which he might properly have charged to the borrower. But it is impossible from this accounting to separate such sums from the gross sums charged and received. It is apparent the transaction was, in effect, a demand of a bonus as a condition of making the loan, which the borrower paid. In some instances that was all he ever paid or could be made to pay. It frequently appears that borrowers furnished searches which Case was called upon to examine. Such searches were doubtless paid for by the borrowers. There is a good deal of reason to believe, from the evidence, that the borrowers paid all, or very nearly all, legitimate expenses attending the loans and then paid the per centage demanded by way of bonus. However that may be, the executor and Case, his law partner, shared between them in some form the sums received from the borrowers. For a time they received it on joint account and divided it equally like the receipts of their law business. As this course was obnoxious to criticism, an arrangement was made to evade the natural consequences of such conduct and to avoid the inferences that might be drawn therefrom. Then it was agreed that Case should own the commissions thus received. But that the executor might not lose his share of the profits, Case, in consideration thereof, was to pay an equivalent towards office expenses of the law firm. Thus, in any event, the executor was stipulating for a share of all sums received from borrowers on account of loans made to them.

The executor undertakes to justify his conduct. He alleges these moneys did not come out of the estate; that the estate

has not paid them, and therefore he has not made these profits out of the estate.   He also alleges they were payments made for legal services rendered.   The last assertion has been partially considered.   Case was either the attorney for the executor or for the borrower.   If for the executor, then the bonus obtained from the loans continued to be assets in the executor's hands belonging to the estate.   He had never parted with them, and he would not be at liberty to charge such sums to the estate under the plea or pretense that they had been included in the loan.   If Case was the attorney for the borrower, then the executor is grossly censurable.   He places the funds of the estate in the hands of the borrower or his attorney without exercising the slightest care, discretion or judgment, such as the law requires of him.   He does this in consideration of the commissions he is to share.   He, in effect, farms out the funds of the estate and transfers his duties under his trust as a lender to the borrower.   He says to Case, " Here are the funds of this estate.   I don't want to be troubled with them.   If any of your friends want to borrow them, you lend the money, but you must understand you are not my agent or attorney but the attorney for the borrower.   All I ask for the abdication of my duties as trustee in your favor, the only consideration for shutting my eyes and betraying my trust is, that you shall pay to, or for me one half of all you can squeeze out of the borrowers by way of bonus, commission or fictitious claims for services and expenses."

In this mode the property is made subservient to the interests of the executor and Case.   The executor gets his commissions from the estate for what he ought to do.   He fails to do it, but transfers to some irresponsible person his rights and duties.   Such person administers the property for the benefit of the executor and himself.   Such administration almost of necessity involves loss and invites plunder.   Public policy will not sanction such a mode of discharging trust duties, or the employment of such means of personal gain to the trustee.

After charging the executor with all these illegitimate gains,

the estate is still heavily the loser by the mode in which the business was done. The executor is responsible for amounts received and retained by Case as well as those received by himself. They were acting by a common purpose. What was done was by the authority and consent of the executor. Case's acts were attributable to the executor, and the latter was justly charged with Case's receipts thus obtained.

The case would not be more palpable if the executor had allowed Case to loan the money of the estate at four, five or six per cent, while one, two or three per cent was obtained from the borrowers for the benefit of the executor and Case. In the present case the money was loaned upon poor security, because a heavy bonus could be there obtained. On good securities it could not be had. In the case supposed, the money is loaned at a low rate of interest, because the difference between that and a fair rate can be pocketed by the trustee and his partner. The wrong is too evident for discussion.

It is not simply that this money comes out of the estate, though that is practically true, but it is because to tolerate such conduct would expose trust estates to the rapacity of self-interest scarcely concealed and to most destructive waste. Trustees would cease to be responsible for the discharge of the duties imposed by law upon them. They would be authorized to transfer them to a partner, a clerk or a stranger upon such terms as should yield the greatest profit to the trustee without reference to the interests of the trust estate.

Undoubtedly, professional services rendered by a trustee who is a lawyer, to and for the benefit of another, may be charged for and the lawyer may keep the money so earned. But such transactions cannot be made a cover for bleeding the estate by stealth and indirection. The services rendered must be distinctly charged, must be consistent with the interests of the estate, must not be mixed with other and improper charges so as to be indistinguishable and incapable of separation. The charges in this case were not of the kind described. If there were any such which were capable of separation they

might properly be allowed to the executor. There are none, or at least the executor in his accounting has not shown any such items in a way to entitle him to be allowed therefor. If he suffers any wrong in this respect it is occasioned by his fault and neglect.

There is a further exception to the disallowance by the surrogate of a payment by the executor of $450 to one Cottrell, or his agent, in connection with the loan on the Smith property the executor obtained, as collateral security for the payment of the debt, an assignment of all the rents, profits and issues of the mortgaged property, with authority to collect the same. Out of the collections thus made the executor paid to Cottrell $450 upon a chattel mortgage which, it is said, Cottrell held against the personal property of Smith. It is now claimed that at the time of taking the mortgage an agreement by parol was made, whereby the executor agreed to pay this amount out of the rents collected, to Cottrell, who took a chattel mortgage on Smith's personal property. Such an agreement, if made, was in direct conflict with the real estate mortgage, by which the rents were to be applied to the payment of that mortgage only. If such parol contract was made before the real estate mortgage, by the parties thereto, it was merged in the mortgage. If after, it was without consideration so far as appears, and besides, was a contract which the executor had no right to make to the detriment of the security of the estate, which he already had. But it does not appear that Smith, the mortgagor, was a party to any such contract, or that Cottrell had any valid prior lien on the mortgaged premises. Again, as it was no part of the executor's duty to pay Smith's chattel mortgage out of the assets of the estate, he ought at least to have demanded and received an assignment of the security which he paid, to wit, the chattel mortgage. In that way it may be assumed, though possibly not true, that the estate would have obtained, through the chattel mortgage, what it had lost through his payments from rents derived from the mortgaged premises. No reason is

assigned, or can be imagined, why the executor was not entitled to all the security Cottrell had against Smith upon payment to Cottrell of his debt. We think, therefore, the executor was properly charged with such $450, thus lost to the estate. Should the amount ultimately be realized from Smith, it may become possible for the executor to reimburse himself.

There was no provision of the will making it the duty of the executor to sell and convert the United States bonds belonging to the estate, for the purpose of investing the proceeds in bonds and mortgages. Yet it was in the discretion of the executor to do this. So far as his sales of such securities are concerned, no fault can be found with him. He realized the market rates, which were higher than when the inventory was taken. The incompetency and gross negligence, if not wrong, occurred when the investments were made. If they had been made with proper care and judgment, such as a trustee should possess and exercise, no great harm could have come to the estate, though it would doubtless have suffered loss in any event from the sale of the choice securities left by the testator.

The executor cannot justify his action by any example set him by the testator in his life. The duties of a trustee are not regulated by the practice of any individual or class of men, but by well-settled principles of law of long standing. Experience has shown the necessity of a strict adherence to safe, equitable rules for the protection of trust funds. This may, and often does, work hardships upon trustees, who may have acted with good faith and honestly for what was believed the best interest of the funds in their hands. But it is better that trustees should occasionally suffer harshly rather than to destroy the security of beneficiaries or the safety of trust estates by weak indulgence in sympathy or charitable disregard of wrong or misconduct.

The result of the examination of this case leads to the affirmance of the decree of the surrogate with costs against the appellant personally.